In re J.C. INVESTORS, LTD., Debtor.

BAY CLUBS INTERNATIONAL, INC., Plaintiff,

v.

J.C. INVESTORS, LTD., A Florida limited partnership, Defendant.

Bankruptcy No. 85–01395 BKC AJC. Adv. No. 87–0088 BKC AJC A.

United States Bankruptcy Court, S.D. Florida.

July 10, 1987.

---

Herbert Stettin, for Bay Clubs Int'l., Inc.

Raymond Ray, for J.C. Investors, LTD.

Eliot Borkson, for debtor.

## MEMORANDUM DECISION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS

A. JAY CRISTOL, Bankruptcy Judge.

Bay Clubs International, Inc. (BCI) filed an adversary complaint against J.C. Investors, Ltd. (debtor) seeking recission, money damages, and set off for fraudulent representations resulting in breach of a settlement agreement under which BCI purchased both the lease to operate the Jockey Club and certain personal property used in the operation of the club.

The matter was tried to the Court on April 9, 1987, April 17, 1987 and May 7, 1987. Upon the evidence presented, the Court makes the following findings and conclusions:

1. Walter C. Troutman (Troutman) is the president and sole stockholder of J. Club, Inc., the general partner of the debtor. The debtor operated the Jockey Club under a lease from The Jockey Club Inc., at all times material to these proceedings, until November 27, 1985, at which time BCI closed on its purchase of the debtor's lease and related personal property.

2. Richard Stevens (Stevens) is the president of BCI. BCI entered into management and reorganization agreements with the debtor in the summer 1985, both of which terminated within a short period of time.

3. The financial condition of the debtor deteriorated further after the commencement of these Chapter 11 proceedings, and on behalf of BCI, Stevens negotiated for the purchase of the Jockey Club under a Settlement Agreement dated November 1, 1985, with Robert Larsen, the principal of The Jockey Club, Inc., the fee owner; Midwest Federal Savings & Loan Association, the mortgagee on the Jockey Club property; and Troutman and his attorney Eliot Borkson, on behalf of the debtor, as operator of the Jockey Club under a lease agreement.

4. That agreement contemplated a linked transaction by which BCI would purchase both the fee and the lessee's interest in the property so as to terminate a burdensome and uneconomic lease. In addition, it provided BCI would purchase all of the debtor's other assets, including all its accounts receivable, and the assumption of certain of the debtor's scheduled liabilities.

5. Because the cash flow available from operations of the club was insufficient to fund daily operations, the parties agreed in Section (5)(c) of the Settlement Agreement that the debtor could "invade" annual dues payments up to $61,500 to cover operating expenses until the closing. There was an express understanding made by the debtor that any sum used in excess of that figure "shall be charged against the debtor."

6. The Settlement Agreement was confirmed by Court Order dated November 12, 1985. A closing with the debtor was held November 27, 1985, and a closing for purchase of the fee occurred on February 21, 1986.

7. The evidence at trial clearly reflected that although BCI had access to the books and records of the debtor prior to the signing of the Settlement Agreement on November 1, 1985, those records were incomplete and posting entries were not current. The Court finds those records were not nearly complete, accurate or current enough for BCI to have determined the true state of facts concerning the matters hereinafter discussed.

8. After the closing BCI learned the annual dues had been "invaded" by $79,818 more than the agreed $61,500 referred to in Section 15(c) of the Settlement Agreement. Trial exhibit 14 reflects the breakdown of the amount and date of the excess dues invasion. As provided in the Settlement Agreement BCI is entitled to have this sum credited in its favor and charged against the debtor.

9. After the closing various claims were asserted by creditors of the debtor as liens against the fee interest purchased by BCI. These claims were not on the schedule of debts assumed by BCI and were in fact unknown to BCI. BCI was obligated to pay these claims to avoid foreclosure against its property and seeks recovery from the debtor. The debtor claims it made no representations to BCI as to these debts; sold BCI no property subject to these claims, and that BCI did not rely on any representations made by the debtor concerning these claims. Each argument is rejected. First, the Settlement Agreement clearly spells out that BCI was purchasing both the fee and the leasehold estates with the intention of merging the leasehold into its fee ownership. Both pruchases were consideration for the deal, although each came from a different seller. As such, the debtor's representations in the Settlement Agreement concerning debts assumed by BCI were false and known to be so by the debtor, since the evidence at trial showed the debtor knew of the mechanic's lien claim asserted by Carlson Construction Company the lien claim of the Condominium Associations and the German investors; and the mortgage lien claim against the Troutman Villa.

10. As a result of these liens, BCI paid $24,385 to Carlson Construction Company, as shown in trial exhibit 19; $46,987.81 to the Condominium Association as shown in trial exhibit 16; $52,614.88 to the German investors, as shown in trial exhibit 17; and $14,458.98 to the mortgagee of the Troutman Villa, as shown in trial exhibit 18.

11. Because these claims were enforceable as liens against property which the debtor knew BCI was purchasing in reliance on the representations contained in the Settlement Agreement, and because these claims were not in the schedule of assumed liabilities, BCI's reliance was justified. BCI was damaged by these omissions.

12. In addition to the misrepresentations noted above, the debtor also misrepresented the sale to BCI of an account receivable in the name of Paul Anderson for $162,133.25, representing a note obligation Anderson incurred when he became a limited partner of the debtor, and an account receivable in the name of Troutman for $21,120.23. At trial the more credible and believable evidence proved that Anderson's note had been paid off by the debtor as consideration for his sale back to the debtor of his limited partnership interest. The debtor knew his note was paid but failed to advise BCI of this fact. The debtor represented the Anderson note account receivable to be a valid debt when it knew otherwise. The evidence as to the Troutman receivable was even more egregious. Upon demand being made for payment of this debt, Eliot Borkson wrote (Trial exhibit 4) the obligation had been satisfied prior to closing, and that it was not canceled through a clerical oversight. The Court rejects this as inherently improbable.

13. In addition, BCI claimed the right to offset sums paid to DeWoody and Company, CPA's, for preparation of the debtor's partnership tax returns for 1985. Eliot Borkson, acknowledged BCI's right to offset these sums against the debtor (trial exhibit 13, letter dated August 14, 1986). The testimony proved was that $5,000 had been paid by BCI to DeWoody and Company for preparation of the returns.

14. The Court previously announced it would grant the debtor's motion for directed verdict as to those claims asserted in Section 6(h) of the adversary complaint, representing sums voluntarily paid by BCI to unsecured creditors of the debtor which were not expressly assumed by BCI.

## CONCLUSION

1. The Court has jurisdiction over the parties and the subject matter of this adversary complaint.

2. The plaintiff has proven its right to a credit in its favor for $79,818, representing the excess over $61,500 of annual member dues used by the debtor, as provided by Section 15(c) of the Settlement Agreement. Plaintiff is entitled to set off this sum against any monies due or to become due to the debtor and Troutman under the terms of Section 15(g), requiring indemnification.

3. The plaintiff has proven its right to a credit in its favor of $5,000, representing sums paid to DeWoody and Company for preparation of the debtor's 1985 tax returns. Plaintiff is entitled to set off this sum against any monies due or to become due the debtor and Troutman under the terms of Section 15(g), requiring indemnification.

4. The plaintiff has proven its right to a credit in its favor of $162,133.65, representing the amount scheduled as the Paul Anderson account receivable; and $21,120.23, representing the amount scheduled as the Troutman account receivable. The debtor materially misrepresented these sums as assets being sold to BCI in the Settlement Agreement when it knew they were not valid accounts receivable. Plaintiff reasonably relied upon these representations to its detriment. Plaintiff is entitled to set off the sum of $182,253.88 against any monies due or to become due the debtor and Troutman under the terms of Section 15(G), requiring indemnification.

5. The plaintiff has proven its right to a credit in its favor of $24,385.30 for sums paid to Carlson Construction Company to satisfy a mechanic's lien against the Jockey Club property. This sum was paid by plaintiff upon an obligation of the debtor which was not an assumed debt. The Court finds the debtor knew the claim could be asserted against the property being sold to BCI under the terms of the Settlement Agreement, and withheld this information. The Court further finds BCI did not know of this lien claim prior to the Settlement Agreement. Plaintiff is entitled to set off the sum of $24,385.30 against any monies due or to become due the debtor and Troutman under the terms of Section 15(G) requiring indemnification.

6. The Plaintiff has proven its right to a credit in its favor of $46,987.81, representing sums paid by it to the condominium associations for overcharges by the debtor, in order to avoid lien claims against the Jockey Club property. This sum was paid by plaintiff upon an obligation of the debtor which was not an assumed indebtedness. The Court finds the plaintiff is entitled to a set off of the sum of $46,987.81 against any monies due or to become due the debtor and Troutman under the terms of Section 15(G), requiring indemnification.

7. The plaintiff has proven its right to a credit in its favor of $52,614.88, representing sums paid by it to the German investors for a debt due by the debtor, in order to avoid lien claims against the Jockey Club property. This sum was paid by plaintiff upon an obligation of the debtor which was not an assumed indebtedness. The Court finds the plaintiff is entitled to a set off of the sum of $52,614.88 against any monies due or to become due the debtor and Troutman under the terms of Section 15(G), requiring indemnification.

8. The plaintiff has not proven its right to a credit in its favor of $14,458.98, representing sums paid by it to the mortgagee of the Troutman Villa for a debt due by the debtor in order to avoid foreclosure against the Jockey Club property.

9. The Court finds plaintiff is not entitled to recission of the Settlement Agreement, but is entitled to money damages for breach of the agreement and material misrepresentations by way of offset against any sums due under Section 15(G) of the

**950**

Settlement Agreement, in the amounts set out above.

As is required by B.R. 9021(a), a separate judgment will be entered in accordance with this Memorandum Decision.